**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| BEST PALLETS INC. and BEST INDUSTRIAL PALLETS, L.L.C., by and through their President and Owner JAMES L. TAYLOR; ITNOLAP PALLET & CRATING, INC., by and through its President and Owner WILLIAM M. CLARK; ITNOLAP PALLET & CRATING, L.L.C., by and through its President and Half-Owner WILLIAM M. CLARK; PALLET EXPRESS, INC., by and through its Vice-President and Owner LYNN RIDGE BELL; and GOEMAN'S WOOD PRODUCTS, INC., by and through its President and Owner DANNY J. GOEMAN, for themselves and all others similarly situated,<br>    PLAINTIFFS AND PROPOSED CLASS<br>    REPRESENTATIVES,<br><br>vs.<br><br>BRAMBLES INDUSTRIES, INC., and BRAMBLES NORTH AMERICA, INC., d/b/a CHEP USA,<br>    DEFENDANTS. | Case No:  08-2012<br>The Honorable Robert T. Dawson<br>U.S. District Judge<br><br><br><br>ORAL ARGUMENT REQUESTED<br>**PUBLIC VERSION** |

**DEFENDANTS' BRIEF IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

**CONFIDENTIAL INFORMATION FILED UNDER SEAL HAS BEEN
REDACTED FROM THIS PUBLIC VERSION OF THE BRIEF**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

REQUIREMENTS FOR CLASS CERTIFICATION ................................................. 7

      1.     Rule 23(a)....................................................................................... 7

      2.     Rule 23(b) ...................................................................................... 8

THE ELEMENTS OF PLAINTIFFS' CLAIM .......................................................... 9

ARGUMENT ............................................................................................................ 10

I.      BECAUSE THE GEOGRAPHIC MARKETS FOR PALLETS ARE REGIONAL, PLAINTIFFS CANNOT PROVE A VIOLATION OF SECTION TWO THROUGH COMMON, CLASS-WIDE EVIDENCE. ....................................................... 10

      A.     Plaintiffs Cannot Prove A Section 2 Violation Without Defining A Relevant Market In Which There Is Dangerous Probability Of Achieving Monopoly. ....... 11

      B.     The Relevant Geographic Markets For Pallets Are Local Or Regional. ....... 12

      C.     Common Issues Do Not Predominate Because Plaintiffs Must Present Separate Proof Of Monopoly Power and Anticompetitive Effects For Each Regional Geographic Market. ....................................................................... 15

      D.     Named Plaintiffs' Claims Are Not Typical Of Most Absent Class Members' Because They Compete In Different Geographic Markets. .................................. 17

II.     PLAINTIFFS CANNOT SHOW EITHER INJURY-IN-FACT OR ANTITRUST INJURY THROUGH COMMON CLASS-WIDE EVIDENCE. ...................................... 17

      A.     Plaintiffs Cannot Prove That Each Class Member Was "Coerced" To Handle CHEP Pallets Without Individualized Inquiry...................................................... 19

          1.     *Individualized Proof Is Required As To Whether CHEP's Alleged Coercive Tactics Were* Noerr-*Protected.* .................................................. 19

          2.     *Individualized Proof Is Required As To Whether Each Class Member Handled CHEP Pallets Because of "Coercion."* ...................................... 20

      B.     Plaintiffs' Proposed Methodology For Proving Injury-In-Fact and Antitrust Injury On A Class-Wide Basis Is Incomplete................................................................ 23

i

C.    Plaintiffs Cannot Prove That The Costs Each Class Member Incurs In Handling CHEP Pallets Exceeds The Compensation CHEP Pays Without Individualized Inquiry..................................................................................................26

D.    Plaintiffs' Proposed Methodology For Proving That Recyclers Incurred Net Costs Handling CHEP Pallets Is Fundamentally Flawed. ...............................................29

1.    *The Michael/Ray methodology for measuring how CHEP's behavior impacts individual recyclers overstates those costs and does not produce reliable results. ........................................................................................31*

2.    *Plaintiffs' proposed sampling methodology is designed to show only average impact, not to show that every class member was injured. ..........35*

3.    *Plaintiffs' sampling and surveying methodology fails to comply with basic scientific principles. ...................................................................37*

4.    *The sample size that would be required to develop a reliable estimate of average damages is too large to be manageable. .....................................38*

III.    PLAINTIFFS CANNOT PROVE DAMAGES THROUGH COMMON PROOF...........40

A.    There Are Inherent Conflicts Among Class Members. ..........................................40

B.    Plaintiffs Cannot Use An Average To Measure Damages....................................42

IV.    BECAUSE OF THE PREDOMINANCE OF INDIVIDUAL QUESTIONS OF LAW AND FACT OVER COMMON QUESTIONS, THE CLASS ACTION VEHICLE IS NOT SUPERIOR. ........................................................................................43

CONCLUSION.................................................................................................................44

ii

**PUBLIC VERSION**

## TABLE OF AUTHORITIES

### CASES

*Al Barnett & Son, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43 (D. Del. 1974) ........................42

*Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978)....................................................18

*Albertson's Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459 (10th Cir. 1974) ...............................42

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..............................................................7

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)..............................................17

*Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340 (8th Cir. 1995)....................................12, 18, 24

*Becnel v. KPMG LLP*, 229 F.R.D. 592 (W.D. Ark. 2005) ............................................................8

*Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003) .........................................18, 43

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) ........................................................ *passim*

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) ..............40, 43

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...............................................................13

*Buckeye Diamond Logistics, Inc. v. CHEP USA*, Case No. 3-01-cv-440-WHR (S.D.
Ohio) ...................................................................................................................20, 43

*Buckeye Recyclers v. CHEP USA*, 228 F. Supp. 2d 818 (S.D. Ohio 2003)..................................21

*CHEP USA v. Mock Pallet Co.*, 138 Fed. Appx. 229 (11th Cir. 2005) ...................................20, 23

*CHEP USA v. Mock Pallet Co.*, Case 02-cv-2053-BBM (N.D. Ga.) ...........................................44

*Chmieleski v. City Products Corp.*, 71 F.R.D. 118 (W.D. Mo. 1976)...........................................16

*Christiana Mortgage Corp. v. Delaware Mortgage Corp.*, 136 F.R.D. 372 (D. Del. 1991).........41

*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 661 F. Supp. 1448
(D. Wyo. 1987) ..............................................................................................................24

*Cordes & Co. Fin. Services v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007) ...............9

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ......................................................35

iii

**PUBLIC VERSION**

*DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171 (8th Cir. 1995) ....................................17

*Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213 F.3d 198 (5th Cir. 2000)......................43

*FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999) ....................................11, 12, 14

*Franklin Container Corp. v. Int'l Paper Co.*, No. 77-3204, 1982 WL 1958 (E.D. Pa. May 12, 1982) ............................................................................41

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982)..........................................................7

*Glictronix Corp. v. Am. Tel. & Tel. Co.*, 603 F. Supp. 552 (D.N.J. 1984) ....................................42

*HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543 (8th Cir. 2007)................................15

*H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531 (8th Cir. 1989) ..................................23

*Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219 (2d Cir. 2006) ................................15, 16

*Her v. Regions Fin. Corp.*, No. 07-2017, 2008 WL 552754 (W.D. Ark. Feb. 27, 2008)...............7

*In re Beer Distribution Antitrust Litig.*, 188 F.R.D. 549 (N.D. Cal. 1998) ....................................42

*In re Beer Distribution Antitrust Litig.*, 188 F.R.D. 557 (N.D. Cal. 1999) ....................................18

*In re Coca-Cola Bottling Co.*, 118 F.T.C. 452 (1994), *rev'd on other grounds*, 85 F.3d 1139 (5th Cir. 1996)..............................................................15

*In re Hydrogen Peroxide Antitrust Litig*, 552 F.3d 305 (3d Cir. 2008)...............................8, 10, 37

*In re Milk Prods. Antitrust Litig.*, 195 F.3d 430 (8th Cir. 1999) ....................................17

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008)............8, 25

*In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603 (N.D. Ga. 1997)...........................30

*In re St. Jude Med., Inc.*, 522 F.3d 836 (8th Cir. 2008)..........................................41

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981)............................................17

*Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003 (10th Cir. 2002)..........................................12

*Midwest Commc'ns v. Minnesota Twins, Inc.*, 779 F.2d 444 (8th Cir. 1985) ..................17, 23, 25

*Murphy Tugboat Co. v. Crowley*, 454 F. Supp. 847 (N.D. Cal. 1978)..........................................24

iv

**PUBLIC VERSION**

*NEPA Pallet & Container Co., Inc. v. CHEP USA*, Case No. C00-605 (Wash. D. Ct. Snohomish Cty.) ...................................................................................................43

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253 (D. Mass. 2008).........30

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001)...................7

*Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 339 F.3d 1001 (8th Cir. 2003)..........43

*Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir. 2000)...................................................42

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49 (1993) ....................................................................................................................................20

*Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484 (8th Cir. 1985)............................19

*San Antonio Tel. Co. v. Am. Tel. & Tel. Co.*, 68 F.R.D. 435 (W.D. Tex. 1975)...........................18

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) .............................................................9

*Steinmetz v. Bache & Co., Inc.*, 71 F.R.D. 202 (S.D.N.Y. 1976) ...................................................44

*T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816 (11th Cir. 1991)..........12

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)........................................................12

*United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir. 1976)................................................15

*United States v. Waste Mgmt., Inc.*, 743 F.2d 976 (2d Cir. 1984) .................................................15

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965).....................11

*White Industries, Inc. v. Cessna Aircraft Co.*, 845 F.2d 1497 (8th Cir. 1988) .......................11, 16

*Windham v. Am. Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) ...........................................24, 25, 41

*Yanai v. Frito Lay, Inc.*, 61 F.R.D. 349 (N.D. Ohio 1973)...........................................................18

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 162 F.R.D. 471 (E.D. Pa. 1995)..........42

## STATUTES AND RULES

Clayton Act, 15 U.S.C. § 15 ...........................................................................................................9

Fed. R. Civ. P. 23.............................................................................................................................8

v

**PUBLIC VERSION**

Fed. R. Civ. P. 23(a) ...................................................................................................7

Fed. R. Civ. P. 23(b) .................................................................................................42

Fed. R. Civ. P. 23(b)(3)...............................................................................................8

### JOURNALS AND OTHER AUTHORITATIVE SOURCES

1 Newberg on Class Actions § 3:13 (4th ed. 2002) .....................................................17

Best Pallets Home Page, http://www.best-pallets.com..................................................13

Chaille Brindley, *2006 Proprietary Pallet Survey:  Recyclers Voice Concern Over Treatment* (2006), http://www.palletenterprise.com/PROPRIETARYPALLETSURVEY.PDF ...................36

Diane Twede,  "A Market-Driven Investigation of Pallet Trends in Grocery Chains," 38 *Journal of Food Distribution Research* 161 (2007) ...........................................12

Federal Judicial Center, Manual on Scientific Evidence (2d ed. 2000).........................37

ITNOLAP Home Page, http://www.itnolap.com/index.html ........................................13

National Weather Serv. Forecast Office Home Page, http://www.srh.noaa.gov/tsa/climate/Fsmsnow.html.........................................37

Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* (7th ed. 2008)................................32

Thomas G. Krattenmaker & Steven C. Salop*., Anticompetitive Exclusion: Raising Rivals' Costs To Achieve Power Over Price,* 96 Yale L.J. 209 (1986) .........................................26

William G. Luppold & R. Bruce Anderson, U.S. Department of Agriculture Forestry Service, Research Paper NE-580 (1986) ...................................................................13, 14

**PUBLIC VERSION**

## INTRODUCTION

Plaintiffs are four pallet recyclers who seek to use federal antitrust law to force Brambles Industries and Brambles North America ("CHEP") to pay them more to return CHEP's pallets than CHEP is willing to pay. Plaintiffs contend that CHEP's refusal to meet their demands constitutes attempted monopolization in violation of Section 2 of the Sherman Act.

In their motion for class certification, Plaintiffs seek to assert this novel claim not only on their own behalf, but also on behalf of a proposed class of all pallet recyclers in the lower 48 states that have acquired CHEP pallets since 2004—a class Plaintiffs estimate could include over 4,000 companies. Plaintiffs fail, however, to meet the basic requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure. For at least two independent reasons, Plaintiffs have not shown—and cannot show—that their claims satisfy either the typicality and adequacy requirements of Rule 23(a), or the predominance and superiority requirements of Rule 23(b)(3), all of which must be proven to certify a class.

*First*, Plaintiffs' unsupported claim that there is a single, nationwide market for wood pallets—the very foundation on which their motion for class certification rests—is plainly and demonstrably wrong. Wood pallet competition takes place in numerous regional markets across the United States, as one would expect with a product for which the cost of transportation over any substantial distance is prohibitively expensive in relation to its value. Without a national market, Plaintiffs cannot meet the predominance requirements of Rule 23(b)(3) because they cannot prove a violation of Section 2 of the Sherman Act on a class-wide basis. Instead, Plaintiffs would have to introduce evidence as to the competitive conditions and the effects of CHEP's conduct in each of dozens, if not hundreds, of regional wood pallet markets across the

1

**PUBLIC VERSION**

country.  Plaintiffs also cannot satisfy the typicality and adequacy requirements of Rule 23(a) because they compete in only a few of those many regional markets.

*Second*, Plaintiffs have not shown—and cannot show—that they can prove through evidence common to the class that every class member was injured by CHEP's conduct, nor what damages they suffered.  Plaintiffs' proposed methodology to prove impact on a class-wide basis is fundamentally flawed in at least three key respects.

- Plaintiffs have proposed no methodology for proving by common evidence that all class members were coerced to handle CHEP pallets, as opposed to doing so voluntarily to advance their own business interests.

- Plaintiffs' plan to use a small sample of recyclers to show that every class member lost money handling CHEP pallets is defective because: (1) it does not accurately analyze the costs incurred by recyclers in handling CHEP pallets; and (2) it is not a methodology that can be used to show that every class member lost money handling CHEP pallets, even if all the recyclers in the sample did.[1]

- Plaintiffs' proposed methodology for proving injury-in-fact and damages is incomplete because it looks only at the costs recyclers incurred handling CHEP pallets and does not take into account other off-setting factors that must be considered in determining whether they suffered lost profits as a result of CHEP's conduct.

Individual questions will predominate over common questions; thus Plaintiffs' proposed class action does not satisfy the predominance and superiority requirements of Rule 23(b)(3).

## FACTUAL BACKGROUND

Pallets are flat platforms used to transport and store a broad range of products through the supply chain, including groceries and other consumer goods.  Most of the roughly two billion pallets used in the United States (Complaint ("Compl.") (Dkt. 1) ¶ 16) are made of wood, although plastic pallets are becoming more common.

---

[1]     In fact, correcting for the errors in their work, the data collected by Plaintiffs' own experts show that some of the recyclers they have studied earned more returning CHEP pallets than they could have earned from selling additional recycled whitewood pallets.  *See infra* p. 34.

**PUBLIC VERSION**

Most wood pallets are made with unpainted lumber and are referred to as "whitewood" pallets.  *See* Decl. of Kevin Shuba (Attach. 1) ¶ 4.  These whitewood pallets come in many different sizes, with the most common being the 48"x40" pallet, which is used to ship groceries and other fast-moving consumer goods.  Raw material and consumer goods manufacturers (which CHEP refers to as "emitters") generally purchase these pallets either from a new pallet manufacturer or from a used pallet recycler, and then typically use them to ship their goods to wholesale and retail distributors.  The distributor may then use the pallet to store or reship the goods.  Once the distributor no longer has any use for the pallet, it will dispose of it, often by selling the used pallet to a pallet recycler, who will then repair the pallet and resell it.  *See* Decl. of D. Lane Pence (Attach. 2) ¶ 8.

There are substantial inefficiencies associated with this one-way logistics model for pallet use under which an emitter has to buy a pallet and then can use it for only one shipment. *See* Shuba Decl. ¶¶ 14-17.  Accordingly, in 1990, with the support of the Grocery Manufacturers Association, CHEP introduced into the United States the pooling model it had developed in Australia.  *See id.* ¶ 14.  Under this pooling model, CHEP leases, rather than sells, 48"x40" pallets to emitters, thereby retaining ownership of the pallet.  CHEP then recovers its pallets from the distributor to whom it is shipped, inspects and, if necessary, repairs them, and then reintroduces them into the pool for lease to another emitter.  Because its pallets are designed to be used multiple times, CHEP pallets are built to be more durable than other pallets, which helps ensure their safety and sturdiness for multiple trips through the supply chain.  To aid in their recovery and denote CHEP's ownership in its pallets, CHEP paints its pallets a distinctive, trademarked blue that is recognized throughout the industry.  *Id.* ¶¶ 7-10.

**PUBLIC VERSION**

When it first entered the United States, CHEP operated a "closed loop" pooling system in which emitters could not use CHEP pallets to ship to a distributor unless CHEP had an agreement with that distributor to return its pallets (referred to by CHEP as "Participating Distributors" or "PDs"). *See id*. ¶ 18. In 1997, at the urging of some major customers, CHEP switched to a modified "open loop" system, allowing certain select emitters to ship goods on its pallets to distributors with whom CHEP did not yet have an agreement ("Non-Participating Distributors" or "NPDs"). *Id.* ¶¶ 19-20. CHEP imposed a surcharge on these shipments, recognizing that pallets shipped to NPDs might require more effort, time, and expense to recover as compared to pallets shipped to PDs. *See* Decl. of James W. Jacoby (Attach. 3) ¶ 5.

CHEP named this new modified "open loop" system its Accelerated Volume Program ("AVP"). Plaintiffs claim that the AVP shifts to recyclers some of CHEP's costs in recovering its pallets because pallets shipped to NPDs end up in the hands of recyclers who are then required to return them to CHEP without receiving what they view as adequate compensation. *See* Compl. ¶ 47. Plaintiffs claim that this constitutes attempted monopolization, notwithstanding that ten years after the program was launched, CHEP accounts for only about five percent of wood pallets in the United States and faces competition from more than 4,000 pallet manufacturers, recyclers, and other suppliers. *See id.* ¶ 31.

Plaintiffs allege that CHEP has used litigation and threats of litigation to force recyclers to collect its pallets without adequate compensation. *See id.* ¶ 42. They fail to tell the Court that instead CHEP has undertaken a systematic effort to recover its pallets directly from pallet users, rather than recyclers, and thereby minimize the number of stray pallets that end up in the hands of recyclers. *See* Shuba Decl. ¶ 21; Jacoby Decl. ¶¶ 6-7.

4

**PUBLIC VERSION**

CHEP understood that some recyclers might nevertheless come into possession of CHEP pallets from time-to-time.  Therefore, in 2001-2002, CHEP developed an Asset Recovery Program (or "ARP") that pays recyclers who do acquire its pallets a fee for returning its pallets. Shuba Decl. ¶¶ 27-28.  The level of compensation initially ranged from $0.50 to $2.00 per pallet. CHEP has increased its compensation over time; today, CHEP pays recyclers $1.25 if CHEP picks up its pallets at the recycler's location, and either $2.25 or $3.00[2] plus a fuel surcharge (historically between $0.11 to $0.45 per pallet, depending on the price of diesel) if the recycler returns the pallets to a CHEP service center.  *See* Jacoby Decl. ¶ 9.

CHEP has also entered into a variety of mutually beneficial business arrangements with various recyclers to help in recovering its pallets.  The most important is CHEP's regional whitewood contract program, under which recyclers can get a supply of the used whitewood pallets ("cores") they need to run their business in exchange for helping CHEP recover its pallets.[3]  Whitewood cores are inputs into a recycler's business; recyclers repair these cores and sell them.  These cooperative efforts have improved not only CHEP's pallet recovery performance, but also its relationships across the industry, including with recyclers.  *See* Shuba Decl. ¶ 28; Jacoby Decl. ¶¶ 19-21.  Many recyclers now find that they benefit from working with CHEP.  *See, e.g.*, Decl. of **[REDACTED]** (Attach. 4) ¶¶ 3, 6; **[REDACTED]** Tr. at 84:2-4; Jacoby Decl. ¶ 9.

Plaintiffs' Complaint acknowledges that CHEP pays recyclers for returning its pallets but claims that CHEP compensates only "a small number of class members."  *See* Compl. ¶ 45.  In

---

[2]     The $3.00 rate is for recyclers who return CHEP pallets from a distance greater than 200 miles. *See* Jacoby Decl. ¶ 9.

[3]     Other arrangements include transportation and other pallet handling services. *See* Jacoby Decl. ¶¶ 23-28.

**PUBLIC VERSION**

fact, CHEP has compensated more than **[REDACTED]** individual recycler locations under ARP from July 2003 to July 2008.  Jacoby Decl. ¶ 11.

The Complaint further alleges that CHEP's compensation is inadequate and that this threatens recyclers with exclusion from the market, giving CHEP monopoly power.  *See* Compl. ¶ 50.  CHEP is presenting a report by Dr. Daniel Rubinfeld, one of the nation's preeminent experts in antitrust economics, to show that neither of these claims can be proven through evidence common to the class.  *See* Report of Daniel L. Rubinfeld (Attach. 5) ¶¶ 14-16.  As he shows, Plaintiffs' estimates of the losses recyclers incur handling CHEP pallets are substantially overstated.  Correcting for the errors in their estimates, Dr. Rubinfeld shows that no more than half of the eight recyclers Plaintiffs' experts studied lost money handling CHEP pallets.  As a group, the eight recyclers earned at least an additional $30,000 as a result of handling CHEP pallets.  *Id.* ¶ 168.

Even Plaintiffs' own evidence contradicts their claims of potential exclusion and resulting monopoly power.  Recyclers admitted that the volume of CHEP pallets recyclers handle represents only a "tiny" percentage of their total pallets.  *See* **[REDACTED]** Tr. at 323:15-17.[4] Dr. Rubinfeld shows that, even accepting the inflated calculations of Plaintiffs' experts, the costs recyclers incur handling CHEP pallets are therefore a tiny percentage of their revenues—less than one-half of one percent for most of the eight recyclers Plaintiffs studied.  *See* Rubinfeld Report ¶ 100.  Plaintiffs cannot prove through common evidence that these trivial cost increases

---

[4]    *See also* **[REDACTED]** Tr. at 78:8-81:21 (testifying that CHEP pallets were less than **[REDACTED]** percent of the company's volume in the last two quarters of 2007 and first two quarters of 2008); **[REDACTED]** Tr. at 138:9-13 (testifying that CHEP pallets were less than **[REDACTED]** percent of the company's total volume in 2005).

**PUBLIC VERSION**

(overstated as they are) create a dangerous probability of monopoly power in any market, much less in all the regional geographic markets for wood pallets in the lower 48 states.[5]  *See id.* ¶ 87.

## REQUIREMENTS FOR CLASS CERTIFICATION

For a class to be certified, Plaintiffs must show that the requirements of both FED. R. CIV. P. 23(a) and 23(b)(3) have been met.  *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005).  Certification is proper only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites" of Rule 23 are met.  *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Her v. Regions Fin. Corp.*, No. 07-2017, 2008 WL 552754, slip op., at *2 (W.D. Ark. Feb. 27, 2008) (Dawson, J.).  This must include "a thorough examination of the factual and legal allegations" in the complaint.  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001).  It must also include a "preliminary inquiry, looking behind the pleadings," into "whether, given the factual setting of the case, if the plaintiffs['] general allegations are true, common evidence could suffice to make out a prima facie case."  *Blades*, 400 F.3d at 566.

### 1.    Rule 23(a)

Under Rule 23(a), the Court may certify a class only if Plaintiffs can show that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.  *See* FED. R. CIV. P. 23(a); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

---

[5]      According to the recyclers themselves, CHEP's conduct is not currently likely to exclude from the market any of the Plaintiffs or the recyclers their experts studied.  At least six of the eight recyclers in the Michael/Ray study are profitable, and several have substantially expanded their businesses in recent years.  *See, e.g.*, **[REDACTED]** Tr. at 37:4-7; **[REDACTED]** Tr. at 32:10-33:8.  Plaintiffs' experts admitted, therefore, that the recyclers they studied are not in any imminent danger of going out of business.  *See* Ray Tr. at 224:15-21, 350:6-351:3, 450:6-17, 484:18-21.

**PUBLIC VERSION**

     **2.**     **Rule 23(b)**

In addition to meeting the requirements of Rule 23(a), a proposed class action must also satisfy one of the prongs of Rule 23(b).  FED. R. CIV. P. 23.  These Plaintiffs pursue certification under the predominance prong of Rule 23(b)(3).  Compl. ¶ 55.  This requires them to prove that questions of law or fact common to the class *predominate* over individual questions of law or fact, and that a class action is superior to other methods for efficiently and fairly adjudicating the controversy.  FED. R. CIV. P. 23(b)(3).

Under Rule 23(b)(3), common questions predominate only if "common evidence could suffice to make out a prima facie case for the class," such that Plaintiffs will not "need to present evidence that varies from member to member." *Blades*, 400 F.3d at 566; *see also Becnel v. KPMG LLP*, 229 F.R.D. 592, 596 (W.D. Ark. 2005) (Dawson, J.) ("If in order to make a prima facie showing on a given question, the members of a proposed class would need to present evidence that would vary from member to member, then it could only be an individual question.").  To determine this, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008) (citations omitted).  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) (citations omitted).

In formulating this prediction, a district court is required to conduct a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *Id.* at 312.  "This extends to the resolution of expert disputes concerning the impact of evidence concerning the factual setting—such as economic

**PUBLIC VERSION**

evidence as to business operations or market transactions." *Blades*, 400 F.3d at 575; *accord Cordes & Co. Fin. Services v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107 (2d Cir. 2007) (admonishing district courts to resolve disputes between experts at the class certification stage).

## THE ELEMENTS OF PLAINTIFFS' CLAIM

In this action, Plaintiffs seek to recover damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.[6] There are two elements to this cause of action:  "To recover damages under section four of the Clayton Act, plaintiffs must prove defendants violated the antitrust laws *and* that the plaintiffs suffered some resulting injury, and plaintiffs must estimate the measure of damages." *Blades*, 400 F.3d at 566 (emphasis added).  Therefore, in order satisfy the Rule 23(b) predominance standards, "plaintiffs need to demonstrate that common issues prevail as to the existence of [the violation] and the fact of injury." *Id.*

Here, Plaintiffs allege a violation of Section 2 of the Sherman Act for attempted monopolization.  The offense of attempted monopolization requires proof  "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  As this Court held in denying CHEP's motion to dismiss, this last element requires that Plaintiffs prove "a realistic possibility—in light of the product market and its geographic scope—that monopoly can be achieved."  August 11, 2008 Order (Dkt. 23) at 5; *see Spectrum Sports*, 506 U.S. at 459 (proving "dangerous probability of monopolization in an attempt case . . . requires inquiry into the relevant product and geographic market").

For Plaintiffs to recover under Section 4 of the Clayton Act, a violation of Section 2 alone is not enough.  Because "individual injury (also known as antitrust impact) is an element of

---

[6]     The Clayton Act provides for a private right of action under the Sherman Act.

**PUBLIC VERSION**

the cause of action; to prevail on the merits, *every* class member must prove at least some antitrust impact resulting from the alleged violation."  *In re Hydrogen Peroxide*, 552 F.3d at 311 (emphasis added); *accord Blades*, 400 F.3d at 571 (affirming denial of class certification because evidence "demonstrate[d] that not every member of the proposed class[] can prove with common evidence that they suffered impact from the alleged conspiracy").  Therefore, "the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide*, 552 F.3d at 311-12.

## ARGUMENT

Plaintiffs fail to meet the requirements of Rule 23 for two simple reasons.  *First*, the relevant geographic markets for wood pallets are regional, not national; Plaintiffs therefore must prove a violation of Section 2 separately for each individual market and cannot use common proof as to the entire class.  *Second*, the impact of CHEP's conduct varies substantially from class member to class member; Plaintiffs therefore cannot prove injury to every class member "through evidence that is common to the class rather than individual to its members." *Id.*  These failures, taken alone or together, require denial of Plaintiffs' motion for class certification.

## I.   BECAUSE THE GEOGRAPHIC MARKETS FOR PALLETS ARE REGIONAL, PLAINTIFFS CANNOT PROVE A VIOLATION OF SECTION TWO THROUGH COMMON, CLASS-WIDE EVIDENCE.

To show a prima facie violation of Section 2, Plaintiffs must prove that CHEP has engaged in anticompetitive conduct that creates a dangerous probability of monopoly power. This cannot be proven without first defining the relevant markets in which CHEP is allegedly seeking a monopoly, and then examining competitive conditions in each such market.  Because there are dozens, if not hundreds, of regional geographic markets for wood pallets (see Rubinfeld

10

**PUBLIC VERSION**

Report ¶¶ 38-41), individual questions about competitive conditions in each market will predominate over any common questions relating to CHEP's conduct.[7]  Defining the proper geographic market is an issue both at the class certification stage, *White Indus., Inc. v. Cessna Aircraft Co.*, 845 F.2d 1497, 1502-03 (8th Cir. 1988), and at the merits stage.

### A.    Plaintiffs Cannot Prove A Section 2 Violation Without Defining A Relevant Market In Which There Is Dangerous Probability Of Achieving Monopoly.

The threshold inquiry in every Section 2 case is the definition of the relevant product and geographic market the defendant is allegedly attempting to monopolize.  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of that market there is no way to measure [a defendant's] ability to lessen or destroy competition."); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999) ("A monopolization claim often succeeds or fails strictly on the definition of the product or geographic market.").

Plaintiffs allege that the relevant market is "the wood pallet product relevant market in the nationwide geographic market within the lower forty-eight states of the United States." Compl. ¶ 81.  Plaintiffs offer no analysis or facts, however, to support their proposed definition. Contrary to Plaintiffs' assumptions, the evidence demonstrates that the geographic markets for wood pallets are local and regional, rather than national, due to the prohibitively high cost of transporting empty pallets over long distances.  Plaintiffs cannot prove a prima facie violation without examining the effect of CHEP's conduct in each individual geographic market, thereby defeating their effort to certify a single nationwide class.  *See White Indus.*, 845 F.2d at 1502-03 ("Because we reject White's theory of nationwide markets for most Cessna aircraft, we affirm

---

[7]    The availability of common, class-wide evidence as to CHEP's policies and procedures is of only very limited value in this case, since the burden of establishing those well-established, written policies and procedures would be slight whether in the class or individual action context.  Furthermore, the important inquiry is the *effect* those policies or practices have on competition and on the class and whether such may be subject to common class-wide proof.

**PUBLIC VERSION**

the District Court's findings that individual questions of fact . . . predominate over common questions.").

> ### B.     The Relevant Geographic Markets For Pallets Are Local Or Regional.

Under the antitrust laws, the relevant geographic market is defined as "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).[8] The scope of the relevant geographic market, therefore, "depends on a number of factors, including 'price data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors.'" *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1027 (10th Cir. 2002) (quoting *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991)).

Here, Dr. Rubinfeld shows that all these relevant factors support a finding of local or regional markets for wood pallets. *See* Rubinfeld Report ¶¶ 46-62.

First, the industry itself views the markets for pallets as regional, not national. *See, e.g.*, Diane Twede, "A Market-Driven Investigation of Pallet Trends in Grocery Chains," 38 *Journal of Food Distribution Research* 161, 163-64 (2007). The Plaintiffs' own websites likewise describe the markets as local. Lead Plaintiff Best Pallets, for example, advertises that its "NW Arkansas location allows us to efficiently serve the pallet needs of the tri-state region of

---

[8]      *See also FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999) ("A geographic market is the area in which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition."); *accord Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345-46 (8th Cir. 1995) ("a geographic market is determined by inquiring into the 'commercial realities' faced by consumers").

**PUBLIC VERSION**

Arkansas, Oklahoma and Missouri."[9]  Such "industry . . . recognition" of the narrow scope of the geographic markets for pallets is an important "practical indicia" that these markets are regional. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Second, pallet customers needing pallets can feasibly obtain pallets only from local suppliers.  **[REDACTED]** testified that all of their sales are within a small geographic area surrounding their plants.  *See* **[REDACTED]** Tr. at 71:21-72:4 ("close to 100 percent" of sales are within a 100 mile radius of its **[REDACTED]** location); **[REDACTED]** Tr. at 55:5-6 ("We will generally not go outside of the borders of **[REDACTED]**."); **[REDACTED]** Tr. at 108:16-20, 109:21-110:1 ("80 percent" of deliveries are "in **[REDACTED]**" and "the other 20 percent" are "delivered in **[REDACTED]**"); **[REDACTED]** Tr. at 147:10-147:17 (Q: "you don't deliver pallets yourself down to **[REDACTED]**?  A:  No. . . . Q: [W]ould the driving distance **[REDACTED]** be prohibitively expensive for you to do that?  A:  I would say it would.").[10]

Third, the high cost of transporting pallets makes shipping pallets long distances prohibitively expensive.  As noted by IBISWorld in its *Industry Report on Wood Container and Pallet Manufacturing in the US*, "shipping wood containers and pallets across long distances is not profitable, given the cost of transport and the product value, and therefore industry participants are reluctant to expand their operations beyond a small area."  *See also* William G.

---

[9]     Best Pallets home page, http://www.best-pallets.com (last visited Feb. 19, 2009).  Named Plaintiff ITNOLAP similarly advertises that its two locations in Murfreesboro, TN and Jonesboro, AR enable it to provide "Service to entire Nashville Metro and Middle Tennessee area from Murfreesboro" and "Service to Northeast Arkansas and Memphis from Jonesboro."  ITNOLAP home page, http://www.itnolap.com/index.html (last visited Feb. 19, 2009).

[10]     *Accord* **[REDACTED]** Tr. at 90:8-13; **[REDACTED]** Tr. at 30:25-31:7; **[REDACTED]** Tr. at 34:16-19.  This testimony is consistent with CHEP's experience with thousands of pallet recyclers, which is that pallet suppliers generally limit their deliveries to within 25-100 miles of their location.  Pence Decl. ¶ 4.  It is also consistent with an industry survey from 2001, finding that pallet companies sold more than 85 percent of their pallets within an 82-mile radius of their plants.  Rubinfeld Report ¶ 41.  In his deposition, Plaintiffs' expert Dr. Michael could not identify a single pallet manufacturer that ships cross-country from Florida to California.  Michael Tr. at 95:8-96:2.

**PUBLIC VERSION**

Luppold & R. Bruce Anderson, U.S. Department of Agriculture Forestry Service, Research Paper NE-580 at 2 (1986) ("[T]he cost of transporting pallets is high relative to the cost of pallet production. Therefore, pallets are normally produced in close proximity to the purchaser.").[11]

Fourth, because of the high cost of shipping across regions, there are substantial regional variations in the price of pallets. Pallet Profile's Recycle Record, a trade publication, regularly reports prices of pallets for various regions throughout the country. These reports show substantial differences in price, even in regions that are relatively close geographically. For example, in September 2008, a Grade A pallet cost $6.55 in Wisconsin but only $5.35 in Ohio. Pence Decl. Ex. B.[12] For a Grade B pallet, the prices were $5.20 in Wisconsin and $3.80 in Ohio. *Id.* Such substantial differences in price would not and could not exist in a single, nationwide market. Rubinfeld Report ¶ 60. If a pallet customer in Wisconsin could buy pallets from Ohio, it would not pay $1.20 to $1.40 more for local pallets. *See id.*; Pence Decl. ¶¶ 4, 11.

All these facts point to the conclusion that there is not a single lower 48 state pallet market. *See* Rubinfeld Report ¶¶ 11, 39-41. Plaintiffs may argue, notwithstanding these indicia of regional markets, that the relevant market for purposes of assessing CHEP's conduct is national because CHEP operates nationally. This argument is contrary to the case law, which establishes that the "critical question" in defining a geographic market is "where consumers . . . could practicably turn for alternative [sources of supply]." *FTC v. Tenet Health Care Corp.*, 186 F.3d at 1052. Here, a farmer in California could not buy pallets from a supplier in Arkansas if pallet prices increased in California; similarly a paper goods company in Arkansas could not buy pallets from a supplier in California. Arkansas and California are, therefore, separate geographic

---

[11]    *See also* Pence Decl. ¶ 11; **[REDACTED]** Tr. at 31:8-16 (Q: "[I]t would be cost prohibitive to ship pallets from the **[REDACTED]** facility to **[REDACTED]**? A: Correct"); **[REDACTED]** Tr. at 90:14-91:11.

[12]    *See also* Goeman's Wood Prods. Tr. at 147:17-148:1; **[REDACTED]** Tr. at 42:23-43:3, 43:9-19.

14

**PUBLIC VERSION**

markets.  That CHEP operates in both does not make them one market.  *See* Rubinfeld Report ¶¶ 66-70.  There are any number of industries in which companies operate nationally, yet the markets are local because customers cannot feasibly purchase from distant suppliers.  *See, e.g., United States v. Empire Gas Corp.*, 537 F.2d 296, 304-05 (8th Cir. 1976) (market for LP gas was local, even though defendant operated in 25 states).[13]

### C. Common Issues Do Not Predominate Because Plaintiffs Must Present Separate Proof Of Monopoly Power and Anticompetitive Effects For Each Regional Geographic Market.

Because there are dozens or potentially hundreds of regional markets for wood pallets across the nation, each with its own distinct supply and demand conditions, Plaintiffs cannot prove, through common evidence on a class-wide basis, that CHEP has a dangerous probability of acquiring monopoly power.  *See* Rubinfeld Report ¶ 34.  If permitted to proceed, Plaintiffs would have to present separate proof of monopoly power in each relevant geographic market in which any class member operates.  *See HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007) (monopoly power is "examined by reference to the offender's share of the *relevant market*") (emphasis added and citations omitted); *Blades*, 400 F.3d at 572 (affirming denial of class certification because "the market for seeds is highly individualized, requiring particularized evidence to determine the competitive price that would have prevailed in the locality of any individual farmer").

---

[13]  Additional examples include such varied products as concert tickets, solid waste removal, and soft drinks.  *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230-31 (2d Cir. 2006) (market for concert ticket local even though defendant operated nationally), *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008); *United States v. Waste Mgmt. Inc.*, 743 F.2d 976, 980 (2d Cir. 1984) (market for solid waste removal local even though defendant operated nationally); *In re Coca-Cola Bottling Co.*, 118 F.T.C. 452, 584 (1994) (geographic market for soft drinks local even though defendant operated nationally), *rev'd on other grounds*, 85 F.3d 1139 (5th Cir. 1996).

15

**PUBLIC VERSION**

Plaintiffs have not even attempted to explain how they plan to prove a dangerous probability of acquiring monopoly power and harming competition through common proof in any market, much less as to each individual market.  Rather, Plaintiffs have simply ignored the existence of these multiple geographic markets, referring instead to "[t]he *market* for the sale of wood pallets."  Mem. of Law in Support of Mot. for Class Certification ("Pls.' Br.") (Dkt. 47) at 4 (emphasis added).[14]  Neither Plaintiffs nor their experts provide any factual support for their claim.[15]  Plaintiffs' economic expert admitted that he does not yet have an expert opinion as to what the relevant geographic market or markets might be.[16]  French Tr. at 157:9-158:1.  By failing to acknowledge the existence of multiple regional markets and by failing to put forth a methodology for showing injury in each (or any) of those markets, Plaintiffs have failed to show that they can prove the monopoly power element of their case through common, class-wide proof.[17]  *See White Indus.*, 845 F.2d at 1502-03 (affirming finding that the lack of a nationwide market resulted in individual questions of fact predominating over common questions).[18]

---

[14]    *See also* Compl. ¶ 18 (discussing "the market for wood pallets in the United States"); *id.* ¶ 48 (discussing "wood pallets in the U.S. marketplace").

[15]    Plaintiffs acknowledged their lack of factual support by responding to a Request for Admission that they are "without knowledge" as to whether putative class members serve limited geographic areas.

[16]    The fact that Plaintiffs have not yet even retained an expert on geographic market definition is tantamount to an admission that they cannot show that the market is national.  The time is now, at the class certification stage, for Plaintiffs to show that they can prove their claims through common, class-wide proof, and this includes whether there are multiple relevant geographic markets.

[17]    Plaintiffs' stated intention to try to prove monopoly power through direct evidence, rather than through market shares, does not relieve them of their burden.  A "plaintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition. . . .  Even if plaintiff attempts to prove her monopolization claims by direct evidence, she will have to rely on market specific evidence of [the defendant's] power in particular markets that will vary from one putative class member to another."  *Heerwagen*, 435 F.3d at 229.

[18]    *See also Chmieleski v. City Products Corp.*, 71 F.R.D. 118, 172 (W.D. Mo. 1976) (denying class certification as to attempted monopolization claims because "the issues of 'sufficient market control' and of 'geographic market' will be determined by evidence relating to the individual markets and individual class members").

**PUBLIC VERSION**

**D.      Named Plaintiffs' Claims Are Not Typical Of Most Absent Class Members' Because They Compete In Different Geographic Markets.**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995).  "[T]he typicality prerequisite emphasizes that the representatives ought to be squarely aligned in interest with the represented group."  1 NEWBERG ON CLASS ACTIONS § 3:13 (4th ed. 2002) (internal quotation marks and citations omitted).  Here, because the four named Plaintiffs operate in different geographic markets from most of the recyclers they seek to represent, their claims are distinct from those of the vast majority of class members.  Thus, most absent class members' claims would require an inquiry into CHEP's alleged monopoly power in geographic markets in which *no* named Plaintiff operates and that likely have different competitive characteristics.  As the Eighth Circuit has recognized, such geographic differences show that a proposed class representative does not meet Rule 23's typicality requirement.  *See In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) (affirming district court decision that a class representative's claim was not typical because, in part, it resided in only one of three geographic markets populated by class members).

**II.      PLAINTIFFS CANNOT SHOW EITHER INJURY-IN-FACT OR ANTITRUST INJURY THROUGH COMMON CLASS-WIDE EVIDENCE.**

In addition to proving an antitrust violation, a plaintiff must also establish the existence of injury to itself, often referred to as "injury-in-fact" or "impact," in order to recover under Section 4 of the Clayton Act.  *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981).  Moreover, a plaintiff must show that the injury it suffered was "antitrust injury," that is, "injury of the type the antitrust laws were intended to prevent."  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *see Midwest Commc'ns v. Minnesota Twins, Inc.*,

**PUBLIC VERSION**

779 F.2d 444, 450 (8th Cir. 1985) ("if there is no showing of injury, or if the injury alleged or proven is not 'antitrust injury,' the plaintiffs do[] not have a claim cognizable under the antitrust laws").  "Inflicting painful losses on competitors 'is of no moment to the antitrust laws if competition is not injured.'"  *See Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 344 (8th Cir. 1995)) (citation omitted).[19]

Thus, to satisfy the "predominance" standard under Rule 23(b)(3), Plaintiffs must show that the impact of the alleged antitrust violation on each class member "can be proven on a systematic, class-wide basis."  *Blades*, 400 F.3d at 569.[20]  "In making the determination as to predominance, of utmost importance is whether 'impact' should be considered an issue common to the class and subject to generalized proof, or whether it is instead an issue unique to each class member."  *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 320 (5th Cir. 1978) (denying class certification in a Sherman Act §§ 1 and 2 case); *see also Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("Accordingly, we have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to

---

[19]     Plaintiffs try to avoid this requirement set forth by the Supreme Court, dismissing it as "semantic camouflage," "fur on a frog," and "litigational whining."  Pls.' Br. at 26-27.  Notably, in their brief discussion of injury to competition, they say nothing about how an alleged harm to one recycler could constitute harm to competition; instead, they make a passing reference to "the consumer."  *Id.*  But they have brought their class action lawsuit on behalf of *recyclers*, not *consumers*, and as a result must establish that those *recyclers* suffered injuries cognizable under the antitrust laws.

[20]     *See also San Antonio Tel. Co. v. Am. Tel. & Tel. Co.*, 68 F.R.D. 435, 438-39 (W.D. Tex. 1975) ("[A] prospective plaintiff must show first of all that there was an antitrust violation and if so, he must show that such a violation complained of has directly injured him.  Only then does the case proceed to an inquiry into how much money, if any, will compensate the plaintiff for the injury so proved.") (denying class certification in a Sherman Act § 2 case); *Yanai v. Frito Lay, Inc.*, 61 F.R.D. 349, 352 (N.D. Ohio 1973) ("Defendant is entitled to a determination of the 'fact of damage' as to each of the . . . class members as a prerequisite to recovery . . . .") (denying class certification in a Sherman Act § 2 case); *In re Beer Distribution Antitrust Litig.*, 188 F.R.D. 557, 565 (N.D. Cal. 1999) (where there are "myriad individual questions raised by Plaintiffs' attempted monopolization claim," "individual questions would predominate in the determination of Plaintiffs' attempted monopolization claim and [] class certification is not appropriate . . . ") (denying in part motion for class certification in a Sherman Act §§ 1 and 2 case).

18

**PUBLIC VERSION**

establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.")
(affirming denial of class certification in a § 2 attempted monopolization case).

Plaintiffs have not met this burden.  First, they have not proposed any methodology for
proving that every class member was coerced to collect CHEP pallets, as opposed to doing so
willingly to advance its own interests.  Second, they have not proposed a plan for proving that
CHEP's conduct caused *every* class member to lose profits, which is what they must prove to
show injury-in-fact.  Proving lost profits would require examining not only the costs recyclers
incurred, but also what effect those increased costs had on prices and sales.  Plaintiffs have not
proposed any methodology for this.  Third, the methodology Plaintiffs have proposed to show
the costs recyclers incurred handling CHEP pallets is not properly designed for that purpose and
is both biased and unworkable.  For all three reasons, Plaintiffs have no means to prove class-
wide injury and damages.  Their motion for class certification should, therefore, be denied.

### A.    Plaintiffs Cannot Prove That Each Class Member Was "Coerced" To Handle CHEP Pallets Without Individualized Inquiry.

Central to Plaintiffs' claim is their allegation that every class member is "coerced" by
CHEP to handle CHEP pallets.  *See* Compl. ¶¶ 42-43.  This allegation raises multiple questions
of both law and fact that are not susceptible to common proof.

#### 1.    Individualized Proof Is Required As To Whether CHEP's Alleged Coercive Tactics Were *Noerr-Protected.*

Plaintiffs claim that CHEP has pursued a "campaign of threatening, coercing, suing, and
bringing criminal theft and conversion actions against class members across the United States."
*Id.* ¶ 42.  Absent proof that the actions CHEP has brought or threatened to bring were objectively
baseless, and therefore constituted sham litigation, this alleged conduct is exempt from the
antitrust laws under the *Noerr-Pennington* doctrine.  *See Razorback Ready Mix Concrete Co. v.*

19

**PUBLIC VERSION**

*Weaver*, 761 F.2d 484, 487 (8th Cir. 1985) ("[The] invocation of adjudicative process to press legitimate claims is protected even though its purpose in doing so is to eliminate competition.").

Plaintiffs intend to introduce evidence as to "several civil and, at least, one actual criminal action used by CHEP" allegedly to force recyclers to collect its pallets.  Compl. ¶ 42. CHEP, however, brought these actions to enforce its property rights when it discovered a recycler misappropriating its property by reselling, destroying, or otherwise converting its pallets, not to force them to collect its pallets.  *See, e.g., CHEP USA v. Mock Pallet Co.*, 138 Fed. Appx. 229 (11th Cir. 2005) (holding recycler liable for conversion for sale of 1,200 CHEP pallets).  Where these actions have gone to final judgment, CHEP has generally prevailed. *See id.* at 237; *see also Buckeye Diamond Logistics, Inc. v. CHEP USA*, Case No. 3-01-cv-440-WHR (S.D. Ohio Aug. 11, 2003).

Actions like these to enforce property rights are commonplace and are routinely found to be *Noerr*-protected by the courts.  *See, e.g., Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) (action to enforce copyrights *Noerr*-protected). Because of this, any effort by Plaintiffs to show that CHEP's actions were not *Noerr*-protected would require the Court to examine the facts of each case and the law of the state in which the case was brought to determine whether CHEP's conduct was objectively baseless or was a legitimate exercise of CHEP's need to protect its property rights from recyclers misappropriating its pallets.

2.    *Individualized Proof Is Required As To Whether Each Class Member Handled CHEP Pallets Because of "Coercion."*

Even if Plaintiffs could prove that CHEP's actual or threatened litigation constituted a form of illegal coercion, there is no connection between that alleged coercion and Plaintiffs' alleged injury.  Contrary to Plaintiffs' allegations, CHEP does not coerce recyclers to collect its

20

**PUBLIC VERSION**

pallets; just the reverse.  CHEP makes a concerted effort to recover its pallets directly from pallet users and imposes a lost pallet fee on those users that do not return its pallets.  *See* Jacoby Decl. ¶¶ 16-17; Shuba Decl. ¶¶ 21-22.  CHEP therefore affirmatively discourages recyclers from collecting its pallets.

CHEP recognizes, nevertheless, that, "it is inevitable . . . that a certain number of CHEP pallets [will] get 'lost' by CHEP's customers and make their way into the general accumulated mass of pallets collected and resold by recyclers . . . ."  *Buckeye Recyclers v. CHEP USA*, 228 F. Supp. 2d 818, 819 (S.D. Ohio 2003).  When this happens, CHEP requires that the recycler return its pallets and offers to compensate the recycler for doing so under its Asset Recovery Program.  CHEP sets this compensation at a level designed to provide recyclers an incentive to return its pallets when they come into possession of them, but not so high as to affirmatively encourage recyclers to seek out CHEP pallets from distributors.

There are many reasons why a recycler may choose to acquire CHEP pallets.  First, some pallets users do not separate their whitewood pallets from CHEP pallets, and where the number of CHEP pallets a pallet user has is small relative to the number of used whitewood pallets, a recycler may find it easier and cheaper to take all of the user's pallets and separate out the CHEP pallets at its own facility.  Plaintiffs' own testimony confirms that this is the principal reason they acquire CHEP pallets, not because CHEP forces them to.  *See, e.g.,* Best Pallets (Taylor) Tr. at 140:8-11 (owner of Best Pallets testifying that he is not "compelled . . . to collect [CHEP] pallets").[21]

---

[21]     *See also* Pallet Express (Barber) Tr. at 100:22-101:3 (testifying that Pallet Express has never even talked with one of its major pallet sources "about picking up only the whitewood pallets, not the blue CHEP pallets"); Goeman's Wood Prods. Tr. at 144:17-22 (testifying that Goeman's has never "refused to accept CHEP pallets" from a distributor).

**PUBLIC VERSION**

Second, as part of some recyclers' pallet management services to a pallet user, some recyclers may agree with such a pallet user to return pallets to CHEP on the user's behalf. Typically, in return for these services, the pallet user compensates the recyclers with cash or by selling the recycler its used whitewood pallets at a discount. *See* Jacoby Decl. ¶ 28; **[REDACTED]** Tr. at 108:12-16. Because these recyclers are compensated for their services by the pallet user, CHEP does not pay them for these returns. Again, these recyclers are choosing to handle CHEP pallets as part of their relationship with their own customers, not because CHEP forces them to. *See, e.g.*, **[REDACTED]** Tr. at 78:9-80:4.[22]

Third, recyclers may agree to assist CHEP in recovering its pallets in order to secure a regional whitewood contract with CHEP. Under these contracts, CHEP agrees to sell the recycler all used whitewood pallets from particular distribution centers at which CHEP provides pallet management service in that region at a guaranteed price. Part of the consideration for such contracts is that the recycler agrees to assist CHEP in recovering its pallets. *See* Jacoby Decl. ¶¶ 18-22 & Exs. G-H. Recyclers compete aggressively for these contracts, especially in regions and periods where the supply of whitewood cores is tight. *See id.* ¶ 21.[23] More than **[REDACTED]** recyclers currently have such regional contracts with CHEP. *Id.* ¶ 19. These

---

[22]    Plaintiffs' experts now say that they believe returns that a recycler sorts on a pallet user's premises should be excluded from the class. *See* Ray Tr. at 551:19-552:2; French Tr. at 8:4-8. This suggestion, however, does not solve the fundamental problem because many recyclers who agree to return CHEP pallets on behalf of the recyclers' customers in exchange for cash or discounted whitewood sort those pallets at their own facilities, rather than at the user's site. The physical location at which the sorting takes place makes no difference to the analysis.

[23]    At least two of the Plaintiffs bid for CHEP's whitewood contracts. *See* Jacoby Decl. ¶ 21. Recyclers who bid for these contracts see a real benefit to their business from winning one. *See, e.g.*, Goeman's Wood Prods. Tr. at 82:20-83:15 (CHEP whitewood supply contracts lower recyclers' costs); Best Pallets (Taylor) Tr. at 185:11-186:8, 188:18-189:7 (wanted whitewood contract to get an assured supply of whitewood cores); **[REDACTED]** Tr. at 84:2-4 (describing how his whitewood contract benefits his business).

22

**PUBLIC VERSION**

recyclers account for roughly **[REDACTED]** percent of total returns under the ARP.  *Id.* ¶ 22 & Ex. I.

Finally, some recyclers solicit CHEP pallets from pallet users and dealers, either to earn the ARP fee that CHEP will pay for returning its pallets or to resell those pallets illegally to third parties, convert them into mulch, or otherwise convert them to their own use.  *See* Jacoby Decl. ¶ 16.  Those recyclers who convert CHEP pallets to their own use violate CHEP's property rights, *see, e.g., CHEP USA v. Mock Pallet Co.*, 138 Fed. Appx. at 237-38 (holding recycler liable for conversion of 1,200 CHEP pallets),[24] and CHEP will sue them when necessary to enforce those rights.[25]

None of these four groups of recyclers are "coerced" to collect CHEP pallets; they each do so because it benefits their businesses.  Yet all are members of Plaintiffs' putative nationwide class of recyclers who acquire CHEP pallets.  Plainly, a highly individualized inquiry would be needed to determine whether any class member was coerced to collect CHEP pallets, as opposed to doing so voluntarily to advance its own business reasons.  This could not be done through common proof on a class-wide basis.

> **B.     Plaintiffs' Proposed Methodology For Proving Injury-In-Fact and Antitrust Injury On A Class-Wide Basis Is Incomplete.**

To recover, Plaintiffs must prove that every class member suffered both injury-in-fact and antitrust injury caused by CHEP's conduct.  *See Midwest Commc'ns*, 779 F.2d at 450 ("if the injury alleged or proven is not 'antitrust injury,' the plaintiffs do[] not have a claim cognizable

---

[24]     In *Mock*, discovery revealed that the pallet recycler had printed fliers offering to buy blue (CHEP) pallets from third parties.

[25]     At least one, and perhaps two, of the named plaintiffs appears to have illegally converted CHEP pallets during the class period by selling them to third parties.  *See* Best Pallets (Taylor) Tr. at 216:2-12; **[REDACTED]** Tr. at 176:14-22, 179:9-180:10.

**PUBLIC VERSION**

under the antitrust laws"); *Bathke*, 64 F.3d at 344  ("Inflicting painful losses on competitors 'is of no moment to the antitrust laws if competition is not injured.'") (citation omitted).

For Plaintiffs to have suffered injury-in-fact, they must prove that the increased costs they allegedly incurred handling CHEP pallets caused them to lose profits.  *See H.J., Inc. v. Int'l Tel. & Tel. Corp*., 867 F.2d 1531, 1549 (8th Cir. 1989) ("Whether liability is based upon attempted monopolization or tortious interference, the proper measure of damages is the present value of profits lost as a result of [defendant]'s improper actions . . . .").[26]

This requirement deals another fatal blow to Plaintiffs' motion for class certification. "Accounting for lost profits is a complex exercise."  Rubinfeld Report ¶ 89.  While Plaintiffs have proposed a methodology (albeit a defective one) for showing that class members incurred additional costs from handling CHEP pallets, they have no plan for determining how those increased costs affected their prices or their overall profits.  These are factors that are vital to determining whether a recyclers' profits were affected.  *See id.* ¶¶ 88-101.  But Plaintiffs' experts confess they have not even begun to think about how they would do this.  *See* Ray Tr. at 63:2-14, 67:4-15 (testifying that he has "not begun" that investigation, nor has he "thought about" what methodology he would use).

Plaintiffs must demonstrate now, at the class certification stage, that they have a methodology; merely "'expect[ing]' to develop a formula, which will simplify the computation of individual damages, at some later point in the litigation" is insufficient.  *Windham v. Am.*

---

[26]    *See also Murphy Tugboat Co. v. Crowley*, 454 F. Supp. 847, 853 (N.D. Cal. 1978) ("the appropriate measure of damages in such a case would be the profit which plaintiff would have realized from business it was caused to lose by defendants' unlawful conduct") (attempted monopolization case); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 661 F. Supp. 1448, 1461 (D. Wyo. 1987) ("Because they represent the potential return on output of a competitor excluded from the market, lost profits are an appropriate measure of antitrust injury.") (emphasis added in all), *rev'd on other grounds*, 885 F.2d 683 (10th Cir. 1989).

**PUBLIC VERSION**

*Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977); *see also In re New Motor Vehicles*, 522 F.3d at 25-26 (overturning certification of the class, cautioning that a "court's ability to probe into the viability of plaintiff's proffered theory" of liability is hampered when the plaintiff's expert "had not yet fully formulated all aspects of his analysis").  Plaintiffs' failure even to propose a plan for proving that every class member lost profits by handling CHEP pallets is, therefore, fatal to their effort to certify a class.

Even if Plaintiffs could show that every class member lost profits, that would not be sufficient to prove antitrust injury.  To prove antitrust injury, Plaintiffs must prove that their injury was caused by "the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  *Midwest Commc'ns*, 779 F.2d at 451.  If Plaintiffs were unable to pass their increased costs due to handling CHEP pallets on to their customers, there would be no anticompetitive effect on prices.

Again, Plaintiffs have proposed no plan for showing antitrust injury.  Plaintiffs' economic expert, Dr. Gary French, wrote that he or another economist "will likely be retained" by Plaintiffs "to define the market relevant to plaintiffs' claims, . . . assess the extent to which CHEP's [behavior] serve[s] as a barrier to entry or expansion in the relevant market, and assess the extent to which CHEP's allegedly exclusionary, predatory, and anticompetitive conduct may create a monopoly in the future."  French Report ¶ 39.  But Dr. French admitted that he has not been retained to do this.  French Tr. at 156:20-157:16.  It is insufficient to promise that an expert will likely be retained in the future.  *See Windham*, 565 F.2d at 70.

**PUBLIC VERSION**

C.     **Plaintiffs Cannot Prove That The Costs Each Class Member Incurs In Handling CHEP Pallets Exceeds The Compensation CHEP Pays Without Individualized Inquiry.**

Under their novel raising rivals' costs theory, Plaintiffs must prove that every class member incurred substantial costs handling CHEP pallets for which they were not fully compensated.  *See* Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs To Achieve Power Over Price*, 96 Yale L.J. 209, 243 (1986) (explaining that there would be no anticompetitive effect if "the increase in the input's price [is] so insignificant that it has little effect on the total costs" of the rivals, either because "the input price increase is small or . . . the input . . . accounts for only a small fraction of their total costs").  This requires proof as to both: (a) the revenues each recycler earned for handling CHEP pallets; and (b) the costs each recycler incurred.  Neither can be shown by common proof as to the entire class; both require examining operations of each individual class member.

1.     *Determining the revenues a recycler received requires individualized evidence and cannot be shown through common, class-wide proof.*

Determining the revenues each proposed class member earns from handling CHEP pallets would require an individualized examination of the compensation they receive from CHEP.  It would also require an individualized examination of any revenues class members may have earned from other sources, such as receiving discounted whitewood cores from distributors as compensation for handling CHEP pallets.[27]

---

[27]     In addition to legitimate revenues recyclers earn for providing pallet management services to pallet users, some recyclers may also earn illicit revenues from selling or mulching CHEP pallets. Plaintiff Best Pallets has admitted selling CHEP pallets during the first two years of the class period, 2004-2005, and did not cease doing so until CHEP filed a state court conversion action against it in December 2005.  Best Pallets (Taylor) Tr. at 224:2-5, 216:12.  Plaintiff **[REDACTED]** has likewise admitted selling CHEP pallets to third parties in 2004 and 2005.  **[REDACTED]** Tr. at 176:6-18, 179:9-180:2.

**PUBLIC VERSION**

While the compensation schedule CHEP offers under ARP is the same for all recyclers, the amount of compensation each recycler receives varies depending on how many CHEP pallets it returns, its location, and the manner in which it returns those pallets. Thus, a recycler who has CHEP pick up its pallets at its plant will receive $1.25 under ARP, whereas a recycler who returns the pallets to a CHEP service center will receive either $2.25 or $3.00,[28] plus a fuel surcharge. *See* Jacoby Decl. ¶ 9. The manner in which individual recyclers return CHEP pallets may also change from time to time, at the recycler's discretion. *See, e.g.*, **[REDACTED]** Tr. at 76:6-9 (testifying that he switched from delivering CHEP pallets to having CHEP pick them up because the cost saving exceeded the reduced compensation). Therefore, a separate inquiry for each individual class member would be necessary to determine how much compensation it received from CHEP.

The Michael/Ray pilot study also shows substantial variation in the revenues individual recyclers receive from CHEP for returning its pallets, from a low of $0.13 per pallet to a high of $2.63. Dr. Ray himself acknowledged that some of their revenue computations appear to contain errors. *See* Ray Tr. at 224:1-5. Dr. Rubinfeld has compared the Michael/Ray revenue calculations with the compensation CHEP's business records show was actually paid to each of the eight recyclers in their pilot study. *See* Rubinfeld Report ¶¶ 104-09. He finds that these errors are much more widespread and serious than Dr. Ray realized. These errors, therefore, illustrate just how individualized an examination is required to determine accurately any given recycler's compensation for returning CHEP pallets to CHEP.

While the compensation a recycler received from CHEP may be determined from CHEP's business records, determining the revenues received from third parties would require a

---

[28]    As explained in note 2, the $3.00 rate is for recyclers who return CHEP pallets from a distance greater than 200 miles.

**PUBLIC VERSION**

more extensive examination of each individual's business records.  Where the consideration a recycler received from a pallet user for handling CHEP pallets is in the form of discounted prices for whitewood cores, determining its value would require a study of the market value of a whitewood core in that recycler's region at the time the recycler provided those services.  None of this could be done through common, class-wide proof, especially since the prices of whitewood cores vary from region to region and over time.  *See* Rubinfeld Report ¶¶ 109, 173-85.

> ### 2.    *Determining the costs a recycler incurred requires individualized evidence.*

Determining the costs each recycler incurred in handling CHEP pallets would likewise require a detailed examination of each individual recycler's operations.  More than **[REDACTED]** recyclers returned CHEP pallets under the ARP in the last fiscal year, and more than **[REDACTED]** have done so during the class period.  Jacoby Decl. ¶¶ 11-15.  These recyclers' costs in handling CHEP pallets are affected by many individualized factors.  For example,

- These recyclers range in size from IFCO, which owns more than 60 recycling plants around the country and alone accounts for more than **[REDACTED]** percent of all CHEP pallet returns, to small recyclers who return from one pallet to a few hundred CHEP pallets each year.  *See* Jacoby Decl. ¶ 11 & Exs. C, D.

- Some recyclers obtain large numbers of CHEP pallets from only a few large distribution centers and, therefore, incur relatively low per-pallet costs.  Others (like **[REDACTED]**) obtain just one or two CHEP pallets in each trailer-load of used whitewood pallets they pick up from their customers which may make for a higher per-pallet handling cost.  *See id.* ¶ 11; **[REDACTED]** Tr. at 274:15-275:3; 265:4-5.

- Some recyclers are very close to a CHEP service center (a few miles, for instance) and others are far away (over 100 miles).  Since transportation costs can represent a large fraction of the costs recyclers incur in returning CHEP pallets, distance is likely to be an important factor in determining those total costs.  *See* Jacoby Decl. ¶¶ 12-14.

**PUBLIC VERSION**

- Some recyclers are located in high labor cost, congested metropolitan areas, whereas others are in lower labor cost rural areas. Thus, labor costs associated with handling CHEP pallets likely vary among the class members. *See* White Tr. at 87:21-88:9.

Plaintiffs' own expert reports show the wide variance in recyclers' costs to handle CHEP pallets. Plaintiffs' experts Drs. Judd Michael and Charles Ray conducted a pilot study of eight plants in which they tried to calculate each recyclers' per-pallet costs of handling CHEP pallets. Their study found that the direct costs ranged from a low of $0.65 per pallet to a high of $4.25— a ratio of nearly 7-to-1. Similarly, their study found that the alleged opportunity costs ranged from a low of $0.85 to a high of $10.86—a ratio of 12-to-1. Plaintiffs' very own study, therefore, shows substantial variability among recyclers in per-pallet handling costs.[29]

Notwithstanding these enormous variations in costs among a preliminary study of eight recyclers, Plaintiffs propose to use a sampling methodology to prove both injury and damages to the 4,000 or more estimated class members. But as CHEP shows below and in its Motion to Exclude, their proposed methodology is fundamentally flawed and cannot not be used to prove injury-in-fact, much less antitrust injury, to every class member.

### D.    Plaintiffs' Proposed Methodology For Proving That Recyclers Incurred Net Costs Handling CHEP Pallets Is Fundamentally Flawed.

Plaintiffs plan to have Drs. Michael and Ray undertake a study of recyclers, applying the same methodology as for their preliminary pilot study of eight recyclers, to determine whether each recycler lost money handling CHEP pallets. They intend to select a random sample of an unspecified number of class members for this study. This entire methodology is flawed.

---

[29]    Plaintiffs' expert Dr. Marshall White also testified that the recyclers' handling costs vary significantly from recycler to recycler. White Tr. at 86:9-87:20. Dr. White explained that "real estate land costs, variable would have a huge effect" because for "[p]allet recyclers, their costs of land or real estate costs vary significantly." *Id.* at 87:1-4. Dr. White testified that variations in the costs of handling CHEP pallets would also depend on factors like the number of CHEP pallets they handle, their operating costs, the equipment they use, and their labor rates, *id.* at 86:9-88:9, and that these costs–as well as the price at which recyclers can sell used pallets–vary by region, *id.* at 88:14-19.

**PUBLIC VERSION**

One of Plaintiffs' other experts, Dr. Gary French, claims that if this study shows that all recyclers in the sample lost money handling CHEP pallets, this result "can be extrapolated to conclude that all members of the recycler class were injured." French Report ¶ 34. As shown in Parts A and B above and in the Motion to Exclude, Dr. French's analysis misses two critical steps. First, it overlooks the need to examine whether every class member was coerced to handle CHEP pallets or did so to advance its own business interests. Second, it fails take into account other relevant facts that need to be examined in order to prove that every class member lost profits due to CHEP's conduct, including, importantly, how each recycler's prices and profits were affected by handling CHEP pallets.

But even leaving these threshold problems aside, Plaintiffs' proposed sampling methodology does not provide a "reliable methodology" for proving class-wide impact at trial, as is required to certify a class. *See, e.g., Blades*, 400 F.3d at 570 ("Plaintiffs cannot determine the 'but-for' marketplace necessary to establish antitrust impact without a reliable methodology"); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd*., 247 F.R.D. 253, 269-70 (D. Mass. 2008) ("'The important question in a class certification context is whether after a sneak preview of the issues, the expert approach appears fundamentally flawed . . . .'") (citations omitted); *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 621 (N.D. Ga. 1997) ("it is proper to assess the validity of the proposed methodology to show impact" at the class certification stage).

Plaintiffs' proposed sampling methodology is fundamentally flawed in at least four respects. First, the methodology Drs. Michael and Ray propose to use to calculate the net cost in handling CHEP pallets substantially overstates those costs and is not designed to produce reliable results. Second, Plaintiffs' proposed sampling plan is designed to yield only an average for the class as a whole, and cannot be used to prove that every class member incurred those

30

**PUBLIC VERSION**

costs.  Third, that sampling plan also does not satisfy the generally accepted requirements for constructing a scientific sample.  Fourth, the size of the sample that would be required to produce a reliable estimate of even the average costs incurred by class members would render a class action trial wholly unmanageable.

> 1. *The Michael/Ray methodology for measuring how CHEP's behavior impacts individual recyclers overstates those costs and does not produce reliable results.*

The methodology Plaintiffs plan to use to show that individual recyclers in the sample were injured was developed by two professors from Pennsylvania State University, Drs. Judd Michael and Charles Ray.  Their methodology requires that they visit each recycler in the sample, collect financial data, conduct time studies of their trucking and warehouse operations, and then determine whether the costs each recycler incurred in handling CHEP pallets exceeded the compensation they received from CHEP.  In an effort to show how their methodology would work, Drs. Michael and Ray conducted a preliminary pilot study of eight recyclers.

Dr. Rubinfeld shows in his expert report that the Michael/Ray methodology systematically overstates the costs incurred by recyclers in a manner that violates fundamental principles of economics.  *See* Rubinfeld Report ¶¶ 122-59.  These errors render their methodology biased in a way that is inherent in the methodology itself, and therefore could not be corrected if a class were certified.

First, in computing the direct costs, Drs. Michael and Ray improperly allocate overhead, storage, and other fixed costs.  As Dr. Rubinfeld explains, it is wrong as a matter of economics to allocate any portion of those costs to CHEP pallets because these fixed costs would have been incurred even if the recycler had handled no CHEP pallets.  *See* Rubinfeld Report ¶¶ 113-16.

**PUBLIC VERSION**

Second, in computing the opportunity costs, Drs. Michael and Ray simply assumed that each recycler in their pilot study could have shipped more whitewood pallets in place of CHEP pallets.  An opportunity cost is a "[c]ost associated with opportunities that are foregone when a firm's resources are not put to their best alternative use."  Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 704 (7th ed. 2008).  Here, Drs. Michael and Ray claim that each of the plants in their pilot study incurred opportunity costs in handling CHEP pallets because that reduced the number of whitewood pallets they could sell.  This assumption would be justified only if all of these recyclers were capacity constrained throughout the relevant period; otherwise, there is no reason handling a CHEP pallet would have reduced the number of whitewood pallets sold.  *See* Rubinfeld Report ¶¶ 124-39.  Drs. Michael and Ray have admitted, however, that they did not examine whether the plants they studied were capacity constrained during the time periods covered by their study (2007 and before) as opposed to when they visited the plants in 2008.  *See, e.g.*, Michael Tr. at 159:15-17 ("You're correct that every facility does not necessarily operate at full practical capacity.").  In fact, the owners of most of the plants in their pilot study have testified that their plants were not capacity constrained during much of the period under review.  *See, e.g.*, **[REDACTED]** Tr. at 146:7-13, 148:1-17; **[REDACTED]** Tr. at 52:6-7, 153:13-17; **[REDACTED]** Tr. at 55:1-6; **[REDACTED]** Tr. at 24:21-25:4, 57:1-7; **[REDACTED]** Tr. at 91:21-92:16.[30]

Third, Drs. Michael and Ray systematically overstated opportunity costs by failing to deduct direct out-of-pocket costs associated with selling more whitewood cores.  *See* Rubinfeld

---

[30]    Industry surveys consistently show recyclers often operate under capacity, with capacity utilization varying substantially among regions.  One 2002 survey, for example, showed that the pallet industry was operating at only 58 percent of capacity.  *See* Rubinfeld Report ¶ 137.  Furthermore, Plaintiffs admitted in their responses to Requests for Admission that they are "without knowledge" as to whether class members currently have excess capacity.

**PUBLIC VERSION**

Report ¶¶ 119-24.  Thus, while they assigned to CHEP the direct costs for transporting its pallets to and from the recycler's plant, they did not allocate any transportation costs to the additional whitewood pallets they say could have been sold.  They also did not take into account the production costs a recycler would have incurred in repairing those whitewood cores.  Ray Tr. at 252:18-253:10.  Instead, they simply assumed that the recycler could have acquired an equivalent number of whitewood pallets that needed absolutely no repair.  *See* Michael Tr. at 212:19-22 ("Q:  So you can't tell us, sitting here today, what percentage of Plant 21's pallets did not need to be repaired?  A: I cannot.").  This assumption is wrong.  Recyclers who were questioned about this responded that fewer than ten percent of whitewood cores can be resold without any repair.  *See, e.g.*, **[REDACTED]** Tr. at 80:15-20; **[REDACTED]** Tr. at 142:21-143:8; **[REDACTED]** Tr. at 48:18-22.

Fourth, in computing opportunity costs, Drs. Michael and Ray failed to investigate whether each recycler could have acquired additional whitewood cores had they not handled CHEP pallets.  *See* Rubinfeld Report ¶¶ 142-48.  This is a significant oversight, as several of the recyclers in their study testified that there were times during the relevant period when whitewood cores were in tight supply such that they might not have been able to obtain additional cores. *See, e.g.*, **[REDACTED]** Tr. at 115:8-9; **[REDACTED]** Tr. at 77:2-79:3; **[REDACTED]** Tr. at 60:12-61:10; **[REDACTED]** Tr. at 157:13-158:6; **[REDACTED]** Tr. at 60:7-61:6.

Fifth, in computing opportunity costs, Drs. Michael and Ray, in several cases, overstated the per pallet revenues from selling whitewood pallets and understated the costs of buying whitewood cores.  *See* Rubinfeld Report App. A ¶¶ 40-44, 61-62.  They overstated revenues in some cases by dividing the recycler's *total* revenues by the number of whitewood pallets shipped, even though those total revenues included other revenues, such as from providing pallet

33

**PUBLIC VERSION**

management services.  They understated costs by not taking into account the costs for services the recycler provided to distributors in exchange for the whitewood cores received.  Ray Tr. at 533:11-22.[31]

Dr. Rubinfeld has attempted to correct for these errors to the extent he can with the data Drs. Michael and Ray collected, as well as to correct their misreporting of the number of CHEP pallets returned for their own account, rather than on behalf of a pallet user.  Rubinfeld Report ¶¶ 160-68.  He found that all eight recyclers in their sample earned a *profit* handling CHEP pallets—the compensation they received from CHEP exceeded their direct costs to handle CHEP pallets.  Dr. Rubinfeld further found that, even assuming each recycler incurred opportunity costs (despite evidence that they were not capacity constrained), the profit that at least four of the eight recyclers earned from returning CHEP pallets was greater than what they could have earned by selling more whitewood pallets.  *See id.* ¶ 171.  These four recyclers, therefore, incurred no opportunity costs, and certainly no lost profits.  Dr. Rubinfeld calculates that, as a group, the eight recyclers earned over $30,000 more handling CHEP pallets than they would have earned selling an equivalent number of whitewood pallets.  Rubinfeld Report ¶ 168.

Because their proposed methodology systematically overstates the costs incurred by recyclers, contrary to generally accepting principles of economics and cost accounting, and because the manner in which Drs. Ray and Michael applied that methodology in their pilot study produced fundamentally unreliable results, CHEP has moved to exclude Drs. Michael and Ray's testimony under the standards established by the Supreme Court.  *See Daubert v. Merrell Dow*

---

[31]     Dr. Rubinfeld shows that Drs. Michael and Ray also committed a number of other errors—including several careless computational errors.  *See* Rubinfeld Report App. A.  These errors—most of which served to increase their net cost estimates—further undermine the reliability of their report.  These errors are not surprising.  As Dr. Paul Lavrakas, a leading expert in study design, explains in his expert report, having researchers who know what result the sponsor of the study is seeking is likely to bias the results.  *See infra* p. 37.

**PUBLIC VERSION**

*Pharms., Inc.*, 509 U.S. 579 (1993).  But even if their methodology were reliable, it would be unworkable because it would require such a highly individualized examination of each recycler's operations as to be totally impractical for use in anything other than a sample that would be too small to be used to show injury to the entire class.  *See infra* Part II.D.4.

> 2.    *Plaintiffs' proposed sampling methodology is designed to show only average impact, not to show that every class member was injured.*

Even if Drs. Michael's and Ray's methodology were reliable, it could not be used to show that every class member lost money handling CHEP pallets.  This is because the sampling plan Plaintiffs propose to use is designed only to show the average loss suffered by the class, not that every recycler suffered a loss.

Plaintiffs' expert Dr. Gary French acknowledges that he can only extrapolate that every recycler in the proposed class was impacted by CHEP's conduct *if* every single recycler in the Michael/Ray study lost money handling CHEP pallets.  French Tr. at 132:5-133:3.  He says, however, that if Drs. Michael and Ray's study shows that only some recyclers in this sample have costs that exceed the compensation paid by CHEP, then he can extrapolate that an equal percentage of recyclers in the proposed class were impacted by CHEP's conduct and that this is "all I need to do at the class certification stage."  French Tr. at 134:3-7.  However, the issue is not the proportion of the class that may be impacted.  For certification, Plaintiffs need a plan to prove at trial that every class member was injured.  *See Blades*, 400 F.3d at 571 (affirming denial of class certification because evidence "demonstrate[d] that not every member of the proposed class can prove with common evidence that they suffered impact").

By Dr. French's own admission, unless all the study participants have costs that exceed the compensation CHEP pays them, there is no methodology for showing impact to all class members.  French Tr. at 132:5-133:3.  Dr. Rubinfeld's corrected results show that no more than

**PUBLIC VERSION**

half the recyclers in the pilot study lost money handling CHEP pallets.  His findings are

consistent with the general perception among recyclers as reflected in a 2006 survey, in which

only 63 percent of respondents said they believed that CHEP's ARP "does not cover the costs

associated with acquiring, sorting, safeguarding, storing and returning stray proprietary pallets."

Chaille Brindley, *2006 Proprietary Pallet Survey: Recyclers Voice Concern Over Treatment*

(2006), http://www.palletenterprise.com/PROPRIETARYPALLETSURVEY.PDF (last accessed

Feb. 24, 2009).  Assuming the survey is right, then over one-third of the alleged class members

believe they at least break even returning CHEP pallets.

  The expert Plaintiffs have hired to develop the sampling plan, Dr. Stephen Schneider,

who like Dr. French is employed by Nathan Associates, testified contrary to Dr. French, that his

sampling plan could not be used to show that every class member has been injured by handling

CHEP pallets even if every recycler in the sample was found to have lost money.  According to

Dr. Schneider, his sampling plan is designed only to enable Plaintiffs to estimate the *average*

impact on recyclers of handling CHEP pallets, and cannot be used to show that *every* recycler

was injured.  *See* Schneider Tr. at 126:14-20 (testifying that the study is designed "to come up

with an average," not "the minimum opportunity cost").  However, measuring an *average* value

reveals nothing about how the underlying data is distributed.  *See* Rubinfeld Report ¶¶ 177-82.

Knowing the average cost to handle a CHEP pallet among a sample of a few dozen pallet

recyclers does not allow a researcher to draw a conclusion about whether there are some

**PUBLIC VERSION**

recyclers whose costs per CHEP pallet are much less and who therefore made money returning CHEP pallets.  *See id.* ¶ 179.[32]

Dr. French's and Dr. Schneider's admissions are fatal to Plaintiffs' motion for class certification.  "[T]o prevail on the merits, *every* class member must prove at least some antitrust impact resulting from the alleged violation."  *In re Hydrogen Peroxide*, 552 F.3d at 311 (emphasis added); *see also Blades,* 400 F.3d at 575 (affirming denial of class certification because plaintiffs did not "demonstrate how they could prove inflation through the whole range of list prices for GM seeds").  Plaintiffs have failed "to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members."  *In re Hydrogen Peroxide,* 552 F.3d at 311-12.

> 3.     *Plaintiffs' sampling and surveying methodology fails to comply with basic scientific principles.*

As CHEP explains more fully in its Motion to Exclude, Dr. Schneider's sampling plan, like the Michael/Ray costing methodology, does not meet the minimum standards of FED. R. EVID. 702 and, therefore, cannot be used reliably even to compute an average impact.  When evaluating a survey, a court must ask "[w]as the . . . survey conducted in accordance with generally accepted survey principles and were the results used in a statistically correct way?"  Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 233-34 (2d ed. 2000).  CHEP has retained Dr. Paul J. Lavrakas, a preeminent survey expert, to evaluate Plaintiffs' survey plan.  In his report, Dr. Lavrakas shows that Plaintiffs' survey plan suffers from two fundamental flaws.

---

[32]     For example, knowing that the average yearly snowfall in Fort Smith during the 1980s was 7 inches would not tell a researcher whether there were any years in that decade when there was too little snow to require shoveling.  (Yes, 1.3" in 1989).  *See* Nat'l Weather Serv. Forecast Office Home Page, http://www.srh.noaa.gov/tsa/climate/Fsmsnow.html.

**PUBLIC VERSION**

First, Plaintiffs' experts will conduct the actual interviews that provide the data for their analysis, and this injects potential bias. These are not "interviewers and respondents blind to the purpose and sponsorship of the survey," the standard set forth in the Reference Manual on Scientific Evidence, at 238. *See* Report of Paul J. Lavrakas (Attach. 6) ¶¶ 75-79.

Second, Plaintiffs' counsel developed the list of recyclers eligible to participate in the study. Schneider Tr. at 51:15-20. The expert hired to refine the list of potential respondents testified that he "didn't do anything" to "verify that the list provided by counsel for the plaintiffs was appropriately inclusive," instead, he "took it as a given." Schneider Tr. at 58:3-7. This injects a second, and very serious, source of potential bias. *See* Lavrakas Report ¶ 24.

    4.    *The sample size that would be required to develop a reliable estimate of average damages is too large to be manageable.*

To have a reliable estimate of even average costs, there must be an adequate number of recyclers studied. Plaintiffs' experts appear not to agree on how large their sample would need to be to make even a determination of average impact of CHEP's behavior on recyclers within the levels of confidence and precision generally required for litigation. One of their experts estimated that it would be between ten and thirty recyclers. Michael Tr. at 106:11-12. Another expert testified that it would be "in the neighborhood of 30 to 50." Ray Tr. at 81:2-8. A third believes it would be at least 30, but might be much larger, while conceding that a sample of 100 would be "too costly." Schneider Tr. at 143:6-144:8.[33] Although Plaintiffs' experts have not been able to agree upon or articulate for the Court just what size a sample they believe would be required, the 30 to 50 recycler range in which their guesses fall is far below what would be necessary to produce reliable results to extrapolate to a class of 4,000 potential members.

---

[33]    Notably, Dr. Schneider, Plaintiffs' expert on study design, has testified that he has completed his work in this case and that "other than testifying," he is not aware of anything else he will do in this case. Schneider Tr. at 21:2-7.

**PUBLIC VERSION**

The size of the sample studied is one of the factors that determines whether the results of the study are reliable. As Dr. Lavrakas explains, if the data is clustered together, then a relatively small sample of recyclers might be reliable. But when the data is highly variable, a larger sample size is required in order for its conclusions to be meaningful. Lavrakas Report ¶ 55. Because the Plaintiffs do not currently know whether the data they will collect will be clustered together or highly variable, they cannot state what their sample size will be. But they did study eight recyclers in a pilot project to see if their methodology was feasible, and in that pilot project, the results ranged from a low of $1.62 in burden per pallet to a high of $13.14—an exceedingly wide range. Applying this range to the statistical formula for sample size suggests that they would need a sample of over 800 recyclers in order for their results to meet customary standards of statistical robustness.[34] *Id.* ¶ 57.

In short, Plaintiffs are asking the Court to certify a class without knowing how many individual recyclers Plaintiffs' experts will have to study in order to come up with an estimate of the average impact of CHEP's behavior on class members. They seek class certification without even proposing a methodology for showing that *every* class member was injured. Since there will have to be a mini-trial as to each and every studied recycler to test whether Drs. Michael and Ray have correctly analyzed their revenues and costs, even a sample as small as 30 recyclers

---

[34]     In addition, it would be difficult to complete such a study by the current June 18, 2009 discovery deadline, given that Dr. Michael testified that the analysis takes one or two days on-site at each study participant just to gather the raw data. Michael Tr. at 141:17-20. Dr. Ray, who is co-authoring the study with Dr. Michael, testified that the study takes "about two and a half days on site" plus some off-site time for analysis, for a total of "four to five days" per recycler. Ray Tr. at 95:4-15.

**PUBLIC VERSION**

would impose an enormous burden on the Court's docket.[35]  And a sample as large as 800 would make a trial of this case as a class action wholly unmanageable.

## III.  PLAINTIFFS CANNOT PROVE DAMAGES THROUGH COMMON PROOF.

Plaintiffs propose to measure damages on a class-wide basis by using the same flawed methodology they plan to use to prove impact.  Plaintiffs' experts plan to "calculate the average cost of handling CHEP pallets net of compensation offered by CHEP" and then to compute the "aggregate, class-wide damages . . . by multiplying the net cost of handling CHEP pallets . . . by the number of CHEP pallets handled by recyclers during the class period . . . ."  French Report ¶ 35.  The methodological flaws that make their proposed approach unreliable for purposes of proving impact make it equally unreliable as a measure of damages.

Beyond these serious methodological flaws, there are two additional fundamental problems with Plaintiffs' proposed method for measuring damages.  First, because the relevant measure of damages is lost profits, there are inherent conflicts among class members as a result of which the class cannot satisfy the fundamental typicality and adequacy prerequisites of Rule 23(a).  Second, their proposal relies on averages to measure damages, an approach that has consistently been rejected by the courts.

### A.  There Are Inherent Conflicts Among Class Members.

As a matter of law, Plaintiffs may only claim lost profits as their damages.  *See supra* pp. 23-24.  Courts have consistently found that a lost profits measure of damages is generally not amenable to class-wide proof.  *See, e.g.*, *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155

---

[35]      Even for their pilot study of eight recyclers, it took nearly four full days of deposition time (with consent of Plaintiffs' counsel) to examine Drs. Michael and Ray as to their work, and their deposition testimony revealed that their work contained multiple errors, in addition to the basic methodological errors identified by Professor Rubinfeld.  *See* Mot. to Exclude at 23.  To prepare for a trial on the merits, CHEP might need to hire its own team of experts to conduct a similar study, requiring extensive third-party discovery, including inspections of multiple recycler operations.  The cost would be enormous.

**PUBLIC VERSION**

F.3d 331, 342 (4th Cir. 1998) ("each putative class member's claim for lost profits damages was inherently individualized and thus not easily amenable to class treatment") (reversing judgment in its entirety, in part for improper class certification); *Christiana Mortgage Corp. v. Delaware Mortgage Corp.*, 136 F.R.D. 372, 383-84 (D. Del. 1991) ("when . . . plaintiffs claim lost profits from lost business, it would seem that [the] proof necessarily would focus on the operation of [each individual] business") (brackets in original, citation omitted).

If some recyclers incurred more net costs than others, those recyclers presumably would have lost sales to recyclers who incurred lower costs. Therefore, as in any "lost profits and business case, . . . the proof of impact . . . 'necessarily would focus' on the operation of each affected class member's business. To determine whether defendants' actions resulted in a loss of profits and/or business to one member of the proposed class rather than another [the judge] must know that member's competitive position." *Franklin Container Corp. v. Int'l Paper Co.*, No. 77-3204, 1982 WL 1958, at *4 (E.D. Pa. May 12, 1982) (citations omitted) (denying class certification in a Sherman Act §§ 1 and 2 case). Because of this, "computation of damages would be a complex, highly individualized task, imposing an intolerable burden on the judicial system." *Windham*, 565 F.2d at 70; *see also In re St. Jude Med., Inc.*, 522 F.3d 836, 840 (8th Cir. 2008) ("the need for detailed and individual factual inquiries concerning the appropriate remedy for any violation still weighs strongly against class certification") (reversing district court's grant of class certification).

Where the measure of damages is lost profits, the interests of each class member are necessarily antagonistic to those of other class members, and thus the proposed class does not meet the adequacy requirement of Rule 23(a). As one court explained, in such cases,

> the individual interests will of necessity vie with each other in establishing that
> they, as opposed to their neighboring competitors, would have enjoyed a larger

**PUBLIC VERSION**

portion of the allegedly lost business if it had not been closed to all of them by [defendant]'s allegedly unlawful practices. . . . This conflict of interest among the class members, including the representatives, on an essential element of the cause of action, . . . [is] so overriding . . . that the Court must conclude that the absent class members could not be fairly or adequately protected by the class action device as required by 23(a)(4).

*Al Barnett & Son, Inc. v. Outboard Marine Corp*., 64 F.R.D. 43, 50-51 (D. Del. 1974).[36]

Because the proposed named Plaintiffs compete with other recyclers who would be in the class,[37] they therefore cannot satisfy the adequacy requirement of Rule 23(a).  "It is axiomatic that a plaintiff cannot maintain a class action when his interests are antagonistic to, or in conflict with, the interests of the persons he would seek to represent."  *See Albertson's Inc. v. Amalgamated Sugar Co*., 503 F.2d 459, 463 (10th Cir. 1974); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (overturning certification of a class because it included some "who claim harm from the very same acts from which other class members benefited").

### B.    Plaintiffs Cannot Use An Average To Measure Damages.

Plaintiffs propose to use the average net costs of recyclers studied in their sample to measure damages for the class as a whole by taking that average and multiplying it by the number of CHEP pallets handled by recyclers during the class period.  *See* French Report ¶ 35. But using averages to measure damages in this manner is wholly inconsistent with the established case law on accepted methodologies for measuring damages in an antitrust class action.  As the Fourth Circuit explained, using "abstract analysis of 'averages,'" such as average

---

[36]     *See also Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 162 F.R.D. 471, 478 (E.D. Pa. 1995) ("because each member must prove 'some' lost business, and because the market is limited, the named representative's proof of loss necessarily limits or intrudes upon every other member's ability to prove the same"); *In re Beer Distribution Antitrust Litig.*, 188 F.R.D. 549 (N.D. Cal. 1998) (denying plaintiffs' initial motion for class certification); *Glictronix Corp. v. Am. Tel. & Tel. Co.*, 603 F. Supp. 552, 585-86 (D.N.J. 1984).

[37]     *See, e.g.*, Pallet Express (Barber) Tr. at 125:14-18 (testifying that "we all compete for the same business"); **[REDACTED]** Tr. at 65:20-66:1, 68:16-20; Best Pallets (Taylor) Tr. at 76:10-13.

**PUBLIC VERSION**

profit margin and average additional sales opportunities, is "divorced from any actual proof of damages" and "should [be] a caution signal to the district court that class-wide proof of damages [is] impermissible." *Broussard*, 155 F.3d at 343; *see also Bell Atlantic*, 339 F.3d at 306 (rejecting plaintiffs' proposed use of average labor costs in measuring damages); *Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213 F.3d 198, 208-09 (5th Cir. 2000) (affirming denial of class certification because the damages formula was based on an average of the rates of return of similar businesses).

## IV.   BECAUSE OF THE PREDOMINANCE OF INDIVIDUAL QUESTIONS OF LAW AND FACT OVER COMMON QUESTIONS, THE CLASS ACTION VEHICLE IS NOT SUPERIOR.

Under Rule 23(b), a class cannot be certified unless the court concludes "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b).  The factors a court must consider in making this determination include, *inter alia*, the likely difficulties in managing the class action and the extent to which class members may be able to protect their interests through individual litigation.  *Id.*; *see Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 339 F.3d 1001, 1012 (8th Cir. 2003).

Here, individual questions will predominate over common questions, rendering a class action trial unmanageable.  Moreover, a class action is not necessary for individual class members to protect their interests.  Several recyclers who felt they were being under-compensated by CHEP have already turned to the state or federal courts to address the program's payment levels.[38]  *See, e.g., NEPA Pallet & Container Co. v. CHEP USA*, Case No. C00-605 (Wash. D. Ct. Snohomish Cty.); *Buckeye Diamond Logistics, Inc. v. CHEP USA,* Case No. 3-01-

---

[38]    Plaintiffs claim that "[t]here is no litigation now existing, nor any in the past, between recyclers . . . and CHEP in which the legal basis or claim for relief are [sic] similar to the instant action."  Compl. ¶ 66.  While true that the past cases have not been antitrust cases, they have sought increased payments to recyclers for returning CHEP pallets, which is an element of the relief sought in this action as well.

**PUBLIC VERSION**

cv-440-WHR (S.D. Ohio Aug. 11, 2003); *CHEP USA v. Mock Pallet Co.*, Case 02-cv-2053-BBM (N.D. Ga.).  In addition, recyclers can always decline to accept CHEP pallets if they do not believe CHEP's compensation is sufficient.  A class action, therefore, is neither necessary nor superior to these other available means for adjudicating any potential claims.  *See Steinmetz v. Bache & Co.*, 71 F.R.D. 202, 205 (S.D.N.Y. 1976) (the existence of other suits on the same claim indicates that a class action is not necessary to fulfill Rule 23(b)'s role to encourage suits when claims are otherwise unfit for individual litigation).

<u>**CONCLUSION**</u>

Plaintiffs have failed to satisfy the requirements for class certification under Rule 23. They have failed to meet their burden under Rule 23(a) to demonstrate that their claims are typical of all class members or that they can adequately represent the class; they have also failed to meet their burden under Rule 23(b)(3) to demonstrate that common questions of law and fact will predominate over individual questions, and that a class action is a superior vehicle for adjudicating the claims asserted in this case.  For each of these reasons, the Court should deny Plaintiffs' motion for class certification.

**PUBLIC VERSION**

Respectfully submitted,

William J. Kolasky
Eric J. Mahr
Avery W. Gardiner
Brian M. Simmonds
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-663-6000 – Telephone
202-663-6363 – Facsimile
william.kolasky@wilmerhale.com
eric.mahr@wilmerhale.com
avery.gardiner@wilmerhale.com
brian.simmonds@wilmerhale.com

Clifford W. Plunkett
FRIDAY, ELDREDGE & CLARK, LLP
3425 North Futrall Drive, Suite 103
Fayetteville, AR 72703
479-695-1103 – Telephone
501-244-5343 – Facsimile
plunkett@fec.net

Attorneys for Defendants


By:_____/s/_____
        William J. Kolasky
        D.C. Bar Number 217539

45

**PUBLIC VERSION**

## CERTIFICATE OF SERVICE

I, Brian M. Simmonds, hereby certify that on the 26th day of February, 2009, I caused the foregoing, with its attachments, to be sent via Federal Express overnight delivery to:

Mr. Joe D. Byars, Jr.                          Mr. Herbert T. Schwartz
CHRISTIAN & BYARS                      BAILEY & GALYEN
502 Garrison Ave.                             18333 Egret Bay Blvd., Suite 120
P.O. Box 1725                                   Houston, TX 77058-3860
Fort Smith, AR 72902

_____/s/_____
        Brian M. Simmonds

46

**PUBLIC VERSION**